OPINION *Page 2 
{¶ 1} Defendant-appellant Donald R. Wyant appeals his conviction and sentence entered by the Stark County Court of Common Pleas, on one count of gross sexual imposition, in violation of R.C. 2907.05(A)(4), following a jury trial. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE CASE AND FACTS {¶ 2} On March 30, 2007, the Stark County Grand Jury indicted Appellant on the aforementioned charge. Appellant appeared before the trial court for arraignment on April 13, 2007, and entered a plea of not guilty. The matter proceeded to jury trial on August 9, 2007.
 {¶ 3} Prior to the commencement of trial, the State filed a Motion in Limine, asking the trial court to exclude any evidence of the victim's sexual abuse by an older sibling under the rape shield provision set forth in R.C. 2907.05(E). The trial court tentatively sustained the motion, and indicated it would revisit the issue when the State's expert witness testified. The trial court based its tentative ruling upon the rape shield provision of the Gross Sexual Imposition Statue as well as Evid. R. 403(A). Also prior to trial, the trial court conducted a voir dire of Mariah Wyant, Appellant's daughter and the victim in this matter, to determine whether she was competent to testify. The trial court asked the girl, who was eight years old at the time, numerous questions to assess her memory and ability to communicate her impressions and recollections, as well as her understanding of truths and falsity and her obligation to tell the truth. The trial court *Page 3 
found Mariah age appropriate and competent to testify. Appellant neither objected to the finding nor requested an opportunity to question the child.
 {¶ 4} Appellant requested an opportunity to question Mariah regarding her accusations of sexual abuse perpetrated upon her by her brother, who was fifteen at the time of the abuse. The trial court continued its voir dire of Mariah on this rape-shield issue. Mariah testified her brother started sexually abusing her after Appellant moved out of the family home and subsequently was arrested. The trial court allowed Appellant to question Mariah on this point. Upon conclusion on the questioning, the trial court found the sexual activity occurred after Appellant had been removed from the family home; therefore, was unrelated to Appellant's sexual abuse of Mariah. The trial court sustained the State's Motion in Limine, finding the danger of prejudice and confusion of the evidence outweighed its probative value. Thereafter, the State commenced presentation of its case-in-chief.
 {¶ 5} Lucy Wyant, Appellant's wife and Mariah's mother, testified she has been married to Appellant for 20 years. She has been living in her current residence since November, 2006. Prior to that, she, Appellant and their children lived just outside Navarre, Stark County, Ohio, on Woodland Hill. The family lived in the Woodland Hill residence for nine or ten years. Lucy stated she began working outside the home in November, 2005, because the family needed extra money. She and Appellant worked alternating shifts in order for one parent to remain at home with the children. She added she and Appellant had been homeschooling their children since their oldest son was in first grade, approximately ten years. *Page 4 
 {¶ 6} The Wyant home had three bedrooms; the master bedroom was dark blue in color, the boys' bedroom was tan, and Mariah's room was lavender. At one point in time, Lucy and Appellant slept in Mariah's room. Lucy and the children immediately left the home upon Mariah's disclosure to her. Mariah described two episodes of abuse, one in the blue room and one in the lavender room. Following Mariah's disclosures, Lucy contacted the Stark County Department of Job and Family Services. The Department referred Mariah to Dr. Robin Tener of the Northeast Ohio Behavioral Health for an assessment.
 {¶ 7} Stark County Sheriff's Deputy John VonSpiegel, who works in the child abuse division, testified he was contacted on May 4, 2006, by Kelly Strickland, a social worker from the Department. Deputy VonSpiegel and Strickland went to the Wyant home to speak with Appellant. When the deputy advised Appellant they wished to speak with him about his wife and children, Appellant explained his family was not at home and did not know where or why they had left. During the deputy's conversation with Appellant, Appellant stated there were no domestic issues between him and his wife, and the two had a very good relationship. Appellant added he had a good relationship with all three of his children. Appellant told Deputy VonSpiegel the children were homeschooled, and Lucy had returned to work in November, 2005. Lucy worked midnight shifts and Appellant worked day shifts.
 {¶ 8} When asked about the sleeping arrangements, Appellant explained, because the house was under construction, the three children slept in one room, and he and Lucy slept in another. Appellant explained if Mariah became scared at night due to a bad dream or storm, she would come into her parents' bedroom. Appellant advised *Page 5 
Deputy VonSpiegel he sleeps in the nude, but denied he and Mariah had ever slept in the bed naked together. Appellant informed Deputy VonSpiegel, sometime around December, 2005, Mariah began talking about sexual things, in particular, penises. Appellant described when he was seated, Mariah would straddle his leg and move her body up and down. Appellant told the deputy, a time when he was putting ointment on a sore on Mariah's back, near her buttocks, and Mariah turned to him and asked, "Was that your penis?" Appellant also recalled a time he kissed Mariah on the back of her neck, and she commented to him to save the kiss for daddy and Mariah time. Deputy VonSpiegel described Appellant as very nervous during the interview, and noted he maintained poor eye contact.
 {¶ 9} Dr. Robin Tener testified the Department requested she conduct a mental health assessment on Mariah. Lucy and Mariah presented to Dr. Tener on May 23, 2006. During the initial portion of the assessment, Dr. Tener obtained a history of Mariah, including her schooling and development, from Lucy. Dr. Tener noted Mariah had some language deficits and problems with articulation. The doctor added, although Mariah was chronologically seven years old at the time, she did not find the girl to be developmentally seven years old. Her observations of Mariah suggested the girl had not been exposed to a lot of peer experiences. Dr. Tener added Mariah was very young in her presentation, not having age appropriate interests or speaking in an age appropriate manner.
 {¶ 10} With an anatomically correct female doll, Dr. Tener asked Mariah to point to the different parts of the body. She asked Mariah what she called each part, and *Page 6 
what the part did. Dr. Tener stated Mariah was able to talk about the various parts of the body without any difficultly, and appropriately identified the parts of her body which should not be touched by anyone. The doctor then proceeded to question Mariah about what she would do if someone touched those areas of her body. Mariah did not initially respond to the question, but instead asked for additional dolls. Mariah removed the pants and underpants of the anatomically correct boy doll. Dr. Tener asked the child to tell her about a boy's body. Mariah indicated the front part of a boy was called the "peepee", and when asked what it was used for, Mariah answered the boy rubs his peepee against the girl's peepee. Mariah then illustrated the act using the dolls. Mariah commented to Dr. Tener she and her brother Zach played boyfriend and girlfriend, but it was not for real because the two did not take their clothes off. Mariah proceeded to explain when she played with her father, it was for real.
 {¶ 11} Mariah then disclosed an incident which occurred in the lavender room, and subsequently spoke about occurrences in different rooms of the house. Mariah told Dr. Tener when she took naps with Appellant, he would remove her clothing, usually her underpants as well as his own pants and underpants. Mariah continued Appellant would have her straddle him, rubbing his penis against her vagina. Mariah also described a time when Appellant was lotioning her feet. Appellant had the girl lay on her back with her feet in the air, while he rubbed his penis against her vagina. According to Mariah, these incidents occurred in the blue room and the lavender room of the house. During another incident, Appellant stood behind Mariah, had her bend over from the waist, then rubbed his fingers on her vagina. Dr. Tener noted Mariah was very naïve about the nature of this sexual activity and had no idea such behavior was *Page 7 
wrong. At one point the girl asked Dr. Tener why Appellant no longer lived with the family. Mariah made it clear to the doctor she wanted Appellant to come home.
 {¶ 12} Over the course of meeting with Dr. Tener, Mariah came to understand Appellant's sexual activity with her was wrong. Mariah expressed a lot of responsibility and guilt for what had occurred, believing she had wronged Appellant. In Dr. Tener's professional opinion Mariah was sexually abused by Appellant. Dr. Tener diagnosed Mariah has adjustment disorder with a depressed mood. The doctor recommended Mariah continue with counseling to provide her with an understanding she was not to blame for the situation.
 {¶ 13} Mariah explained she was in court to talk about Appellant because he did bad things to her. Mariah stated Appellant touched his "pee pee" to hers, remembering this occurred in her mother's bedroom, which was the lavender room at the time. Mariah described laying on top of Appellant's stomach as he rubbed his penis back and forth on her vagina. Mariah recalled, during another incident, her bottom started to hurt, and Appellant put "stuff" on her bottom then rubbed his penis against her. Mariah also detailed a time when her mother and brothers were out of the house, getting a movie, when Appellant kneeled on the bed and rubbed his penis up and down on her vagina. Mariah stated this occurred in the blue room. Mariah recalled this was the first time such activity occurred between herself and Appellant.
 {¶ 14} Appellant testified on his own behalf. He acknowledged Deputy VonSpiegel accurately testified regarding the conversation between the two. Appellant explained he had no idea why Deputy VonSpiegel and Kelly Strickland came to his home, but deduced the visit had something to do with his family, noting he knew *Page 8 
something was wrong because his family had been missing for a couple of days. The deputy assured Appellant his family was fine. Appellant recalled being blown away when Deputy VonSpiegel advised him of the accusations against him. Appellant had no idea how or why such allegations began. Deputy VonSpiegel asked Appellant about the family's daily routine, including sleeping arrangements and bathing. Appellant conceded he prefers to sleep in the nude, but denied doing so when he took a nap. Appellant stated he vacated the house following Deputy VonSpiegel's instruction he do so.
 {¶ 15} Appellant described Mariah as "absolutely loving babies", and was always inquisitive as to the what, where, when, and how. Appellant added Mariah was a people pleaser, needing attention from adults rather than playing with toys. Appellant adamantly denied doing the things to his daughter for which he was being accused. He could think of no reason these thoughts came into Mariah's head. On cross-examination, Appellant acknowledged he told Lucy she handled the situation wrong and should have come to him first. Appellant added he could not understand why Lucy had waited until the end of the matter to file for divorce.
 {¶ 16} After hearing all the evidence and deliberations, the jury found Appellant guilty as charged. The trial court sentenced Appellant to a term of imprisonment of five years. Based upon a stipulation of the parties, the trial court adjudicated Appellant a sexually oriented offender.
 {¶ 17} It is from this conviction and sentence Appellant appeals, raising the following assignments of error: *Page 9 
 {¶ 18} "I. THE TRIAL COURT ERRED IN FINDING THE NINE YEAR OLD VICTIM TO BE COMPETENT TO TESTIFY.
 {¶ 19} "II. THE TRIAL COURT ERRED IN ITS APPLICATION OF THE RAPE SHIELD LAW TO EXCLUDE ALL EVIDENCE OF A SECOND ACCUSED PERPETRATOR OF ABUSE.
 {¶ 20} "III. THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 I {¶ 21} In his first assignment of error, Appellant submits the trial court erred in finding nine year old Mariah to be competent to testify at trial.[1]
 {¶ 22} It is well-settled, as the trier of fact, the trial court is required to make a preliminary determination as to the competency of all witnesses, including children and, absent an abuse of discretion, competency determinations of the trial court will not be disturbed on appeal. State v. Frazier (1991), 61 Ohio St.3d 247, 251. In order demonstrate an abuse of discretion, appellant must show more than error of law or judgment, he must show the trial court's attitude was unreasonable, arbitrary or unconscionable. State v. Adams (1980),62 Ohio St.2d 151, 157.
 {¶ 23} The competency of a witness to testify at trial is governed by Evid. R. 601, which provides, "Every person is competent to be a witness except: (A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving *Page 10 
just impressions of the facts and transactions respecting which they are examined, or of relating them truly."
 {¶ 24} "In determining whether a child under ten is competent to testify, the trial court must take into consideration (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful."Frazier, supra at syllabus.
 {¶ 25} The Ohio Supreme Court also addressed the issue in State v.Said (1994), 71 Ohio St.3d 473, noting:
 {¶ 26} "A competency hearing is an indispensable tool in this and similar cases. A court cannot determine the competency of a child through consideration of the child's out-of-court statements standing alone. As we explained in State v. Wilson (1952), 156 Ohio St. 525, 46 O.O. 437, 103 N.E.2d 552, the essential questions of competency can be answered only through an in-person hearing: The child's appearance, fear or composure, general demeanor and manner of answering, and any indication of coaching or instruction as to answers to be given are as significant as the words used in answering during the examination, to determine competency'."
 {¶ 27} The trial court in the instant matter conducted the following inquiry of Mariah:
 {¶ 28} "Q. [Trial Court]: Hello there. Now we can talk, okay?
 {¶ 29} "A. [Mariah Wyant]: (Nods head up and down.)
 {¶ 30} "Q. What's your name? *Page 11 
 {¶ 31} "A. Mariah.
 {¶ 32} "Q. Mariah?
 {¶ 33} "A. Yes.
 {¶ 34} "Q. What's your last name?
 {¶ 35} "A. Wyant.
 {¶ 36} "Q. Mariah, how old are you?
 {¶ 37} "A. Eight.
 {¶ 38} "Q. And eight years old. When did you turn eight?
 {¶ 39} "A. October the 8th.
 {¶ 40} "Q. October the 8th. So you're not too far away from being 9, huh?
 {¶ 41} "A. Two months.
 {¶ 42} "* * *
 {¶ 43} "Well, where do you live, Mariah?
 {¶ 44} "A. Navarre.
 {¶ 45} "Q. Who do you live there with?
 {¶ 46} "A. My mom and my brother, Zach? [sic]
 {¶ 47} "Q. And you're going to go to school. Then what grade will you be in?
 {¶ 48} "A. Second.
 {¶ 49} "Q. Second grade, and does that start pretty soon?
 {¶ 50} "A. Yes.
 {¶ 51} "* * *
 {¶ 52} "Q. And what's the name of the school? Do you remember where you go?
 {¶ 53} "A. Middle school. *Page 12 
 {¶ 54} "* * *
 {¶ 55} "Q. Are you looking forward to that?
 {¶ 56} "A. (Nods head up and down.)
 {¶ 57} "Q. Do you have a lot of friends in your class?
 {¶ 58} "A. Yes.
 {¶ 59} "* * *
 {¶ 60} "Q. I'm going to ask you a couple questions now, and, you know, if I said outside it was snowing, would that be the truth or a lie?
 {¶ 61} "A. Lie.
 {¶ 62} "Q. A lie, and if I said this was black there, would that be the truth or a lie?
 {¶ 63} "A. Lie.
 {¶ 64} "Q. And if I said that I was handsome, would that be the truth or a lie? Now be careful. I'm just kidding you, okay. * * * So you know the difference between a truth and a lie?
 {¶ 65} "A. Yes.
 {¶ 66} "Q. And what happens if you tell a lie?
 {¶ 67} "A. I get in trouble.
 {¶ 68} "Q. How do you get in trouble?
 {¶ 69} "A. By telling a lie.
 {¶ 70} "Q. By telling a lie. That's not a good thing?
 {¶ 71} "A. (Witness shakes head from side to side.)
 {¶ 72} "Q. Do you understand that when you're in this courtroom with me you have to tell the truth? *Page 13 
 {¶ 73} "A. Yes.
 {¶ 74} "Q. And that there would be some people sitting over there?
 {¶ 75} "A. (Nods head up and down.)
 {¶ 76} "Q. And they expect you to tell the truth, okay?
 {¶ 77} "A. Okay.
 {¶ 78} "Q. Can you do that?
 {¶ 79} "A. (Nods head up and down.)
 {¶ 80} "Q. Is that a yes?
 {¶ 81} "A. (Nods head up and down.)
 {¶ 82} "Q. Are you nervous?
 {¶ 83} "A. No; little bit.
 {¶ 84} "* * *
 {¶ 85} "All right. Well, I'm going to find that she is age appropriate, competent to testify."
 {¶ 86} Transcript of Proceedings, Aug. 9, 2007, 119-124.
 {¶ 87} From our review of the voir dire, we find the trial court did not abuse its discretion in finding Mariah was competent to testify. The record reveals she was capable of receiving just impressions of facts and relating them clearly. Mariah clearly demonstrated she knew the difference between telling the truth and telling a lie, and knew the consequences of telling a lie. Although Mariah became confused during her cross-examination, we find such confusion was the result of the manner in which defense counsel presented his questions, and in no way affected Mariah's ability to receive, recall and communicate accurate impressions of fact, understand truth and *Page 14 
falsity, and appreciate the responsibility to tell the truth as required under Evid. R. 601(A).
 {¶ 88} Appellant's first assignment of error is overruled.
 II {¶ 89} In his second assignment of error, Appellant contends the trial court erred in excluding evidence of a second accused perpetrator of abuse on Mariah based upon the rape shield law.
 {¶ 90} The trial court excluded the testimony pursuant to Ohio's rape shield law codified in R.C. 2907.05, which renders inadmissible prior sexual conduct of a victim unless it involves "evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual history with the offender," and only to "the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value." State v. Graber, Stark App. No. 2002CA00014, 2003-Ohio-137. The trial court also found the evidence inadmissible under Evid. R. 403(A), finding the probative value of the evidence was substantially outweighed by its prejudicial value and would serve only to confuse the jury.
 {¶ 91} The determination whether to admit or exclude evidence pursuant to Rape Shield Statute rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. State v.Azbell, Fairfield No. 04CA11, 2005-Ohio-1704 (Citation omitted). Likewise, a trial court's Evid. R. 403(A) ruling will not be disturbed on appeal absent an abuse of discretion. State v. Bethel,110 Ohio St.3d 416, 2006-Ohio-4853 at para. 171. *Page 15 
 {¶ 92} Appellant asserts the exclusion of any reference to the allegations Mariah made against Jeremiah denied Appellant his right to present a complete defense. Appellant adds the evidence of the abuse of Mariah by Jeremiah was critical as it explained the "obvious confusion" in Mariah's testimony.
 {¶ 93} The record reveals the sexual abuse inflicted upon Mariah by her older brother occurred after Appellant had been removed from the family home and followed Mariah's disclosure of Appellant's sexual abuse of her. We find this evidence is irrelevant as to whether or not Appellant committed the offenses against his daughter. Even though Mariah may had been unclear as to when the abuse by Jeremiah specifically occurred, Mariah was clear the abuse by Jeremiah occurred after Appellant was out of the home. Mariah expressed no hesitation describing the specific assaults against her by Appellant. Therefore, we find the trial court did not abuse its discretion in excluding the evidence of abuse by Jeremiah under the rape shield law. The evidence is also inadmissible under the rape shield law as such did not involve "evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual history."
 {¶ 94} Assuming, arguendo, the trial court had abused its discretion in excluding the evidence based upon the rape shield law, we find the trial court did not abuse its discretion in excluding the evidence under Evid. R. 403(A), based upon its determination the probative value of this evidence was substantially outweighed by unfair prejudice, confusion of the issues, or misleading to the jury.
 {¶ 95} Appellant's second assignment of error is overruled. *Page 16 
 III {¶ 96} In his final assignment of error, Appellant challenges the sufficiency and manifest weight of the evidence.
 {¶ 97} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Thompkins, 78 Ohio St .3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89,1997-Ohio-355, 684 N.E.2d 668. "While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenges questions whether the State has met its burden of persuasion." State v. Thompkins, supra at 78 Ohio St.3d 390.
 {¶ 98} In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v.Jenks (1991), 61 Ohio St.3d 259, superseded by the State constitutional amendment on other grounds as stated in State v. Smith (1997),80 Ohio St.3d 89.
 {¶ 99} Specifically, an appellate court's function, when reviewing the sufficiency of the evidence to support a criminal conviction, is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks, supra. This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983), 20 Ohio App.3d 172, 175. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could *Page 17 
have found the essential elements of the crime proven beyond a reasonable doubt." State v. Thompkins, 78 Ohio St.3d at 386.
 {¶ 100} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, 678 N .E.2d 541 super ceded by constitutional amendment on other grounds as stated by State v. Smith,80 Ohio St.3d 89, 1997-Ohio-355, 684 N .E.2d 668, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.
 {¶ 101} Appellant was convicted of gross sexual imposition, in violation of R.C. 2907.05(A)(4), which reads:
 {¶ 102} "(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
 {¶ 103} "* * * *Page 18 
 {¶ 104} "(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."
 {¶ 105} Appellant contends Mariah's disclosure to her mother, her disclosures to Dr. Tener, her grand jury testimony, and her trial testimony were inconsistent as to the number of incidents. Appellant maintains these inconsistencies made Mariah an incredible witness. Appellant adds the other evidence presented by the State was also insufficient to establish his guilt. Appellant concludes the jury lost its way in believing this evidence, thereby creating a miscarriage of justice. We disagree.
 {¶ 106} Appellant places great emphasis on Dr. Tener's assessment of Mariah, from which she determined the child had language difficulties and was not functioning at age appropriate level. Appellant concedes Mariah was very naïve and lived a sheltered life. Mariah's entire social life involved only her family and her church. Her naivety did not, in the jury's view, make her less credible. Mariah innocently disclosed Appellant's conduct to both her mother and Dr. Tener in an almost matter-of-fact way, not recognizing the gravity of Appellant's behavior. Mariah did not initially understand why her disclosures required the removal of Appellant from the family home. Despite coming to recognize her disclosures resulted in the upheaval of her family, Mariah remained consistent in her accusations against Appellant. Dr. Tener testified in great detail about the disclosures Mariah made to her during their sessions together. Without prompting, Mariah used anatomically correct dolls to show Dr. Tener what Appellant did to her. *Page 19 
 {¶ 107} Based upon the foregoing and the entire record in this matter, we find Appellant's conviction was neither against the sufficiency nor the manifest weight of the evidence.
 {¶ 108} Appellant's third assignment of error is overruled.
 {¶ 109} The judgment of the Stark County Court of Common Pleas is affirmed.
 Gwin, J. and Delaney, J. concur *Page 20 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to Appellant.
[1] Mariah Wyant was actually eight years old at the time of trial. *Page 1